IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GLENN W. FORMAN,**<br><br>*Plaintiff,*<br><br>v.<br><br>**FIRST UNUM LIFE INSURANCE COMPANY,**<br><br>*Defendant.* | Case No. 5:19-cv-02756-JDW |

### MEMORANDUM

In the Before Times, people got on airplanes and traveled to important business meetings. In this new era of videoconferences, remote learning, and virtual backgrounds, the notion seems quaint. But to resolve this case, the Court must go back to those earlier times and decide whether a medical condition that prevented Glenn Forman from taking long flights rendered him disabled. The record contains conflicting medical opinions. Because the Court concludes that this case is subject to *de novo* review under ERISA, it declines to resolve those disputes at this stage of the proceedings.

**I.      BACKGROUND**

**A.      The Plan Documents**

First Unum Life Insurance Company of America issued to McKinsey & Co. a Group Long Term Disability Insurance Policy Number 451355, effective July 1, 1987. The Policy defines "disability" and "disabled" as follows:

[B]ecause of injury or sickness:

      1.      the insured cannot perform each of the material duties of his regular occupation; or

  2.  the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:

    a.  performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis;

    b.  earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

(ECF No. 20 at ¶ 8.) The Policy requires employees to satisfy an "elimination period" of 180 days before collecting benefits. (*Id.* at ¶ 9.)

The Policy provides that any changes to it "must be in writing and endorsed on or attached to this policy." (ECF No. 21 at Ex. A, § VI.B.2.) The Policy also includes an integration provision:

> This policy is the complete contract. It consists of:
>
> a. all of the pages;
>
> b. the policy specifications;
>
> c. the attached application of the policyholder;
>
> d. each employee's application for insurance . . ..

(*Id*. at §VI.B.1.)

In addition to the Policy, First Unum issued a Certificate of Coverage and Summary Plan Document ("SPD"), which summarizes the coverage under the Policy. The SPD states that "if the terms of your certificate of coverage and the policy differ, the policy will govern." (ECF No. 21 at Ex. B, p. 1.) It also says, "[t]hese provisions together with your certificate of coverage constitute the summary plan description. The summary plan description and the policy constitute the Plan." (*Id.* at 18.) And:

> The Plan, acting through the Plan Administrator, delegates to the insurance company and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan. The insurance company and Unum

>   Group may act directly or through their employees and agents or further delegate their authority through contracts, letters or other documentation or procedure to other affiliates, persons, or entities.

(*Id.* at 23.)

### B.  Mr. Forman's History of DVTs

Mr. Forman began work with McKinsey in 1994. By 2018, he was a Partner and the Global Head of Research and Analytic Services. In that position, he traveled internationally, including to India, China, Costa Rica, and Poland. From 2012-2017, he took more than 200 such flights.

Mr. Forman's medical history includes diagnoses of deep vein thrombosis ("DVT"), pulmonary embolism, post-thrombotic syndrome/chronic venous insufficiency, heterozygous factor V Leiden mutation, and May-Turner Syndrome. In December 2003, Mr. Forman was diagnosed as having a significant DVT and a pulmonary embolism. He was diagnosed with another DVT in June 2005. In September 2005, Mr. Forman was placed on a daily dose of Coumadin and was advised to self-administer an injection of Lovenox before overseas flights. In May 2015, Mr. Forman switched blood thinners, from Coumadin to Xarelto.

On December 12, 2017, Mr. Forman presented at Lancaster General Hospital with a swollen left leg. He was diagnosed with a new DVT. The ER notes from that visit indicate that Mr. Forman had returned from India on December 1, 2017, and he stopped taking Xarelto that day. The notes say that he had not taken Xarelto since then, but he disputes that and says he stopped for only a couple of days.

Dr. Timothy Medina treated Mr. Forman at the ER. In Mr. Forman's medical chart, Dr. Medina stated that the "patient has not failed outpatient Xarelto because he had just been noncompliant with it." (AR 1352.[1]) On December 13, 2017, Mr. Forman saw his primary care

---

[1] Citations to "AR" refer to the Administrative Record, which the Parties submitted under seal.

3

physician Dr. Bradford Granger. Dr. Granger's notes state that Mr. Forman "[h]ad left lower extremity DVT after stopping Xarelto for 11 days. I would not consider this a Xarelto failure." (AR 304.) Dr. Granger also noted that Mr. Forman "travels frequently for work and I did discuss with him that it would be beneficial from a medical standpoint to reduce his risk of recurrent clots to avoid long airplane flights/immobility." (*Id.*)

On January 11, 2018, Mr. Forman saw Dr. Granger for a follow-up appointment. At that meeting, Dr. Granger noted that Mr. Forman's DVT acute clot had resolved. He also noted his "medical recommendation would be not to fly more than 5 hours at a time, which again precludes performance in his current position." (AR 313.) On January 22, 2018, Mr. Forman had an appointment with Dr. Thomas Reifsnyder at Johns Hopkins University. Dr. Reifsnyder noted that Mr. Forman's DVT had resolved. He noted Dr. Granger's recommendation about restricted travel, but his notes do not reflect whether he agreed with that restriction. On February 28, 2018, Dr. Granger noted that Mr. Forman's venous insufficiency "appears to be controlled at this time." (AR 323.) Dr. Granger also noted that the travel restriction he recommended was "an important part of [Mr. Forman's] overall treatment strategy . . .." (*Id.*) In June 2018, Dr. Granger noted that Mr. Forman's DVT was "well controlled" and had "gradually improved over the last six months since his last clot." (AR 336.)

### C. Mr. Forman's Disability Application

Mr. Forman applied for and received short-term disability benefits. He then applied to First Unum for long term disability benefits based primarily on his inability to travel. In support of his application, he pointed to statements from Dr. Granger and Dr. Reifsnyder recommending that he not take flights over five hours. Dr. Reifsnyder's statement explained, "Although the length of five hours is somewhat arbitrary any long flight clearly would not be in his best interest." (AR 295.)

First Unum had an on-site physician, Dr. Richard Maguire, review Mr. Forman's records. Dr. Maguire concluded that Mr. Forman was not disabled and could continue to travel if he continued to take Xarelto. Dr. Maguire contacted Dr. Granger, who reiterated his view that Mr. Forman could not take flights over five hours. Dr. Maguire also contacted Dr. Reifsnyder. In response to a letter from Dr. Maguire, Dr. Reifsnyder said that Mr. Forman was capable of performing his job duties, including international travel, and said, "Final decision regarding flights should be made by hematologist taking care of hypercoaguable state." (AR 512.) Dr. Reifsnyder later told Mr. Forman's counsel that the cutoff for a long flight should be six hours, not five, and that he was "not qualified to assess [Mr. Forman's] functional capacity." (AR 1475.)

After considering information from Dr. Granger and Dr. Reifsnyder, Dr. Maguire concluded that Mr. Forman was not disabled. First Unum then asked Dr. James Bress to review Mr. Forman's application. Dr. Bress concluded that Mr. Forman was not disabled. First Unum denied Mr. Forman's disability claim.

Mr. Forman appealed First Unum's decision. As part of his appeal, he submitted notes from Dr. Samuel Kerr, a hematologist who "agreed with Dr. Granger and Dr. Reifsnyder that recurrent prolonged plane trips will increase his risk of recurrent thrombosis." (AR 843.) Dr. Kerr opined, "I do not feel he is totally disabled from all work . . . but I do feel that the requirement of his prior employment of frequent prolonged flights (40 a year) definitely puts him at risk of recurrent thrombosis . . . ." (*Id.*) As part of the appeal, First Unum had a registered nurse and Dr. Scott Norris review Mr. Forman's records. Dr. Norris concluded that Mr. Forman was not disabled and could return to work if he took his anticoagulant regularly. On August 1, 2019, First Unum denied the appeal.

Mr. Forman filed this action on June 24, 2019. On December 20, the parties filed cross-motions for summary judgment, which are before the Court.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). The filing of cross–motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* at 560 (citation omitted).

## III. ANALYSIS

### A. *De Novo* or Abuse of Discretion Review

Courts apply a *de novo* standard to review denials of benefits under ERISA "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan gives the administrator or fiduciary discretionary authority to make

6

eligibility determinations, then an abuse-of-discretion standard applies. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). Whether a plan administrator's exercise of power is mandatory or discretionary depends on the terms of the plan. *See Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 414 (3d Cir. 2011). There are no magic words determining the scope of judicial review, and a plan can include an express or implied grant of discretionary powers. *See id.* However, when a plan is ambiguous, it is construed in favor of the insured. *See id.* The plan administrator bears the burden of proving that an arbitrary-and-capricious standard applies. *See id.*

The SPD purports to give First Unum discretion to make benefits determinations. The SPD is not part of the Policy, but it claims to be part of the Plan. First Unum relies on the SPD to claim discretion and therefore to invoke the abuse-of-discretion standard. The Court disagrees, for two reasons.

*First*, the Policy and SPD are in conflict in that the Policy does not include a grant of discretion to First Unum but the SPD does. In interpreting the Policy and the SPD, the Court must give those documents their common and ordinary meaning, from the perspective or a reasonable plan participant. *See ACS/Primax v. Polan ex rel. Polan*, 2008 WL 5213093, at * 5 (W.D. Pa. Dec. 12, 2008) (quoting *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1202 (10th Cir. 1992)). Here, a reasonable plan participant would see that conflict and expect the Policy to control, given that (a) the Policy's integration provision defines the documents that comprise that policy to **exclude** the SPD, (b) the Policy contains an amendment provision that First Unum did not follow, and (c) the SPD says that in the event of a conflict between the Policy and the SPD, the Policy will control. To the extent there is any question about that conflict, the Court must resolve it in Mr. Forman's favor.

First Unum cites cases in which a court treated an SPD as part of the plan. To be sure, there is no categorical bar on incorporating the SPD into the Plan. *See Tetrealut v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 56 (1st Cir. 2014). However, the cases on which First Unum relies have meaningful differences from this case. In one case, the SPD filled a gap in the plan. *See Mull for Mull v. Motion Picture Industry Health Plan*, 865 F.3d 1207, 1209-10 (9th Cir. 2017). In another, the plan itself incorporated the SPD. *See Burell v. Prudential Ins. Co. of Am.*, 920 F.3d 132, 137 (5th Cir. 2016). In a third, the plaintiff did not have the governing plan documents, did not know what was in them, and could not determine if they conflicted with the SPD. *See Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1132 (10th Cir. 2011). These distinctions render these cases inapplicable here.

*Second*, ERISA requires employee benefit plans to include, among other things, a "procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 28 U.S.C. § 1102(b)(3). The Policy complies with that provision. But if First Unum (or any other provider) could modify a plan without complying with the statutory amendment procedures, it would undermine Section 1102's disclosure requirement. Thus, the Court concludes that First Unum had to follow the procedures in the Policy to amend it; it could not use the SPD to alter the Policy.

Although the Third Circuit has not addressed this issue, other circuits have reached the same conclusion. *See, e.g., Jobe v. Medical Life Ins. Co.*, 598 F.3d 478, 484-85 (8th Cir. 2010); *Schwartz v. Prudential Ins. Co. of Am.*, 450 F.3d 697, 699 (7th Cir. 2006); *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1283-84 (11th Cir. 2003); *Grasz-Solomon v. Paul Revere Life Ins. Co.*, 273 F.3d 1154, 1161-62 (9th Cir. 2001). The Court agrees with the reasoning in these decisions. It will apply a *de novo* standard of review here.

### B.  Determination of Disability

Having determined that a *de novo* standard of review applies here, the resolution of these motions becomes easy. The parties do not dispute that travel, including international travel, was a material responsibility of Mr. Forman's job. They have submitted evidence that creates a factual dispute about Mr. Forman's ability to perform at least that function of his job. In conducting a *de novo* review, a district court may not resolve factual disputes at the summary judgment stage. *See Ho v. Goldman Sachs & Co. Group Long Term Disability Plan*, Civ No. 2:13-cv-6104-KM-MAH, 2016 WL 8673067, at * 14 (D.N.J. Oct. 28, 2016); *Sallavanti v. Unum Life Ins. Co. of Am.*, 980 F. Supp.2d 664, 665 (M.D. Pa. 2013). Because the Court cannot resolve that issue, it cannot grant either party's summary judgment motion. It therefore will not address other issues that the parties have raised, such as whether First Unum should have consulted a hematologist as part of its analysis.

## IV.  CONCLUSION

The Court cannot conduct a *de novo* review and resolve this case on the conflicting evidence before it. It will deny the motions for summary judgment and schedule an evidentiary hearing to resolve this case. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
HON. JOSHUA D. WOLSON
United States District Judge

June 29, 2020